UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
NEIL SOOROOJBALLIE,

                Plaintiff,

-vs-                                       15 Civ. 1230 (WFK)

THE PORT AUTHORITY OF NEW
YORK AND NEW JERSEY and GARY
FRATTALI, Individually,

                Defendants.
---------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND REMITTITUR


MARJORIE MESIDOR

PHILLIPS & ASSOCIATES
45 Broadway, Suite 620
New York, N.Y. 10006
(212) 248-7431

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
5 Paradies Lane
New Paltz, N.Y. 12561
(845) 469-1277
Counsel for Plaintiff

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.  Plaintiff's experience and training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.  Frattali denies Plaintiff the boiler training course . . . . . . . . . . . . . . . . . . . . . . . 2

    3.  Frattali denies Plaintiff the Junior Supervisory Assessment . . . . . . . . . . . . . . . 2

    4.  Plaintiff is denied a meal reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    5.  The Watch Engineer position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    6.  Frattali subjects Plaintiff to workplace harassment through racial slurs . . . . . . . . . . . 6

    7.  Plaintiff files an EEO charge with Port Authority . . . . . . . . . . . . . . . . . . . . . . . . 7

    8.  The first February 4, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    9.  The second February 4, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . 10

    10.  The first March 27, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    11.  The second March 27, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    12.  The July 17, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    13.  Plaintiff files a charge of discrimination with the EEOC . . . . . . . . . . . . . . . . . . 13

    14.  Port Authority accuses Plaintiff of sabotaging equipment . . . . . . . . . . . . . . . . . 13

    15.  Plaintiff's pain and suffering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    16.  The verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

    A.  Defendant waived its rights under Rule 50(b) in making a cursory
        Rule 50(a) motion at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B. The jury had an evidentiary basis to find that Defendants subjected
Plaintiff to a hostile work environment on the basis of race/national origin . . . . 18

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

THE DAMAGES AWARD DOES NOT SHOCK THE CONSCIENCE

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

THE PUNITIVE DAMAGES AWARD IS APPROPRIATE

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF AUTHORITIES

*Barham v. Wal-Mart Stores, Inc.*,
  2017 WL 3736702 (D. Conn. Aug. 30, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Brady v. Wal-Mart Stores, Inc.*,
  455 F. Supp. 2d 157 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Creacy v. BCBG Max Azria Grp., LLC*,
  2017 U.S. Dist. LEXIS 49523 (S.D.N.Y. Mar. 31, 2017) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cross v. N.Y.C. Transit Auth.*,
  417 F.3d 241 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*DiSorbo v. Hoy*,
  343 F.3d 172 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Duarte v. St. Barnabas Hosp.*,
  2018 WL 4440501 (S.D.N.Y. Sept. 17, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*E.E.O.C. v. Mavis Discount Tire, Inc.*,
  129 F. Supp. 2d 90 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Fisher v. Mermaid Manor Home for Adults, LLC*,
  2016 WL 7330554 (E.D.N.Y. Dec. 16, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
  136 F.3d 276 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hill v. City of N.Y.*,
  136 F. Supp. 3d 304 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hughes v. PBA*,
  850 F.2d 876 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Kirsch v. Fleet Street, Ltd.*,
  148 F.3d 149 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lewis v. American Sugar Refining, Inc.*,
  325 F. Supp. 3d 321 (S.D.N.Y. Aug. 17, 2018) . . . . . . . . . . . . . . . . . . . . . . 21, 22, 27, 28

*Matusick v. Erie Cty. Water Auth.*,
  739 F.3d 51 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

*Olsen v. County of Nassau,*
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

*Osorio v. Source Enterprises,*
    2007 U.S. Dist. LEXIS 18725 (S.D.N.Y. March 5, 2007) . . . . . . . . . . . . . . . . . . . . . 25, 26

*Patane v. Clark,*
    508 F.3d 106 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Payne v. Jones,*
    711 F.3d 85 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Phillips v. Bowen,*
    278 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Piesco v. Koch,*
    12 F.3d 332 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pucino v. Verizon Communs., Inc.,*
    618 F.3d 112 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Redd v. N.Y. State Div. of Parole,*
    678 F.3d 166 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rivera v. Rochester Genesee Reg'l Transp. Auth.,*
    702 F.3d 685 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Samuels v. Air Trans. Local 504,*
    992 F.2d 12 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Summa v. Hofstra Univ.,*
    708 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Thomas v. iStar Financial, Inc.,*
    652 F.3d 141 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Thorsen v. County of Nassau,*
    722 F. Supp. 2d 277 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Tillery v. Lynn,*
    607 F. Supp. 399 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Whitehurst v. 230 Fifth, Inc.*,
    998 F. Supp. 2d 233 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Winston v. Verizon Servs. Corp.*,
    633 F. Supp. 2d 42 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Woods v. New York City Dep't of Sanitation*,
    1999 WL 476305 (S.D.N.Y. July 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## PRELIMINARY STATEMENT

Plaintiff Neil Sooroojballie submits this memorandum of law in opposition to Port Authority and Gary Frattali's motion for judgment as a matter of law and remittitur.  As demonstrated below, the jury found that Defendants discriminated against Plaintiff on the basis of his national origin and race, awarding $2,160,000 in compensatory damages against Port Authority and $150,000 in punitive damages against Frattali.  The jury properly found in Plaintiff's favor, as Frattali discriminated against Plaintiff through racially offensive statements, adverse counseling memos, scuttling Plaintiff's promotional efforts and falsely accusing him of sabotaging equipment.  As the damages awards do not shock the conscience, this Court should deny Defendants' motion in its entirety.

## STATEMENT OF FACTS

### 1.  Plaintiff's experience and training.

Plaintiff Neil Sooroojballie is a 38 year-old man who was born in Guyana.  (TT 35 [the trial transcript is annexed to the Bergstein Affirmation as Exhibit 1]).  His cultural heritage is West Indian.  *Id.*  He came to the United States 11 years ago.  (TT 36).  Plaintiff began working for Port Authority in January 2001, hired as a Utility System Maintainer (USM) stationed at LaGuardia Airport and responding to heating and cooling issues.  (TT 36-37).  The USM services and maintains the boilers and air conditioning equipment throughout the airport.  (TT 37).  Usually, Plaintiff was the sole USM on duty, and he worked with an engineer.  *Id.*  His direct supervisor was Michael Ward.  (TT 51).  Gary Frattali supervised Ward.  *Id.*

Plaintiff has an associate's degree in HVAC and heat and air-conditioning and refrigeration and holds various licenses in New York and New Jersey, including the New Jersey Black Seal High Pressure License and the New Jersey High Pressure Blue Seal, which authorize

him to operate and maintain a high pressure boiler. (TT 36, 41-42). Other licenses certify Plaintiff to operate "chillers of any size," all-residential back head burners, commercial and city multisystems, air-conditioning systems and high-pressure screw guns. (TT 43-45). He also maintains a pesticide license. (TT 44). *See generally* PX 1 (Plaintiff's various licenses [Exhibit 2 to Bergstein Aff.]). Early on with Port Authority, Plaintiff received praise for his performance, receiving an award for efficiently resolving a troubleshooting call, and winning the Tops in Ops award. (TT 38, 169-170). Plaintiff also won professionalism awards. (TT 39-41).

### 2. Frattali denies Plaintiff the boiler training course.

Plaintiff aspired to become an engineer at Port Authority. (TT 48). For that promotion, he needed to take a boiler training course. *Id.* Plaintiff applied for such a course in summer 2013. *Id.* However, evincing hostility toward Plaintiff's professional advancement, Frattali refused to approve the training "because it's too much for [Plaintiff] to comprehend." (TT 49, 176-77). Ward also disallowed Plaintiff this training. (TT 50). While Defendant suggested at trial that Plaintiff could have taken the course at BOCES on Long Island, Frattali did not tell Plaintiff that he could take the course in another geographical area. (TT 372-73). Nor did Frattali provide management with Plaintiff's request for training out of Port Authority's district. (TT 468). Frattali did not help Plaintiff find a comparable course that would be acceptable to the agency. (TT 373).

### 3. Frattali denies Plaintiff the Junior Supervisory Assessment.

In summer 2013, Plaintiff sought the Junior Supervisory Assessment Evaluation (JSA), in which Ward would assess his performance and skill-set and forward his name to Human Resources, which would evaluate Plaintiff for any promotion, including a supervisory position. (TT 50-51, 53). While Plaintiff was qualified for the JSA in that he had (1) the

2

educational prerequisites; (2) the work experience; and (3) the necessary attendance and discipline records (TT 57-58), Plaintiff was unable to obtain the necessary "supervisor readiness recommendation." (TT 58).

Ward twice told Plaintiff that Frattali "doesn't want to" perform the JSA. (TT 51, 58). When Plaintiff asked Frattali about this, Frattali said Plaintiff could evaluate himself, which is prohibited. (TT 51). When Plaintiff again approached Frattali about the JSA, Frattali said, "what is it with you type of people. I have two more that's driving me crazy, and now I have you to deal with." (TT 51-52). Frattali was referring to Michael Appiah, who is Guyanese, and Govind Patel, who is from India. (TT 52). At trial, Frattali admitted that he did not complete the JSA for Plaintiff. (TT 59, 468-69). In contrast, Frattali conducted the supervisory assessment for Salvatore Funaro, who is white and lacked the requisite three years' experience and necessary licenses. (TT 52-53, 60-62, 393-94, 468-69; PX 57 [Exhibit 3 to Bergstein Aff.]).

**4. Plaintiff is denied a meal reimbursement.**

Plaintiff also ran into Frattali's hostility over the meal reimbursement, which required the agency to reimburse employees up to $25.00 for holiday meals. (TT 66-67). In November 2013, when Plaintiff purchased two meals on the same day, spending less than $25.00, Frattali only approved one meal, reasoning the agency "doesn't know if I'm taking that second meal home for my family, and he made sure that I just got reimbursed just for one meal." (TT 67; PX 4 [Exhibit 4 to Bergstein Aff.]). In contrast, like Plaintiff, a white co-worker, Michael Murphy, had purchased two meals at the same time for one receipt; yet, Frattali approved Murphy's reimbursement for both meals, which at trial Frattali claimed for the first time was merely an "oversight." (TT 67-68, 71-73, 368-69, 515, 731; DX M [Exhibit S to Def. motion]). Co-worker Douglas Oggeri was reimbursed for a meal even though he purchased it at home on Long

3

Island.  (TT 68, 366-67, 515; DX K [Exhibit 5 to Bergstein Aff.]).  Frattali approves the meal reimbursements.  (TT 186-87).  For Plaintiff, this was not about the money.  "It was the point that the other employee, one of them bought stuff from home, took it for his family.  The other one . . . bought three set of meal[s] and he was reimbursed the full amount.  It's never about the money that I did not get; it's the way he did it."  (TT 366).

### 5. The Watch Engineer position.

In August 2013, Plaintiff applied for the Watch Engineer position.  (TT 63).  At the time, Plaintiff had a clean disciplinary record.  (TT 64-65).  While Plaintiff passed the written and performance portions of the examination (TT 65), he was placed on the eligible list (DX G-1 [Exh. E to Def. motion]; PX 13 [Exh. FF to Def. motion]) even though he did not pass the boiler portion of the test.  (TT 230).  But "Frattali made it clear to Mr. Oggeri that he would make sure I would never become a watch engineer at LaGuardia."  (TT 66).  Frattali "never wanted me to elevate within [] LaGuardia."  (TT 66).  Frattali admitted that, when HR asked him to gauge Plaintiff's interest in the Watch Engineer position, he purposefully did not reach out to Plaintiff. (TT 503-05).

In November 2013, Plaintiff was placed on the eligibility list for the Watch Engineer position.  (TT 77-78).  In early 2014, Vincent Piccinich from Human Resources offered Plaintiff that position, which would have paid Plaintiff additional salary and allowed him the five years he needed to sit for the New York City high pressure license.  (TT 73-74).  *See also* DX S [Exh. U to Def. motion] (email from Piccinich to *inter alia* Frattali and Ward stating that Port Authority was offering Plaintiff the position).  But, scuttling Plaintiff's advancement with Port Authority, Frattali told Plaintiff that he "would never be a watch engineer at this facility."  (TT 74).  Plaintiff testified, Frattali "just didn't want me around there.  From my understanding, he

4

was trying to block everything that I was trying to do." (TT 74). Frattali did not tell Plaintiff that he was responsible for letting HR know whether he was accepting or declining the position. (TT 404).

While Frattali claimed Plaintiff was unsuitable for the position because he failed the boiler portion of the Watch Engineer examination, Plaintiff had passed the practical portion overall. (TT 75). While Frattali expressed concern that Plaintiff had failed the boiler portion of the test, it was Frattali who had previously disallowed Plaintiff from attending the boiler course. (TT 76, 78). It was unnecessary for Plaintiff to pass each portion of the practical exam. (TT 76-77, 78-79).

An additional anomaly relating to the Watch Engineer position was that, under the agency's confidentiality rules, Frattali was not supposed to know Plaintiff's assessment results. (TT 100-02, 688-89; PX 40, at 2 ¶ 9 [Exhibit 6 to Bergstein Aff.]). Yet, Frattali conceded that, contrary to protocol, he learned the results of Plaintiff's exam. (TT 75, 482-83). Due to Frattali's intervention, the job offer was revoked. (TT 123-24). In January 2014, Human Resources asked Frattali to see if Plaintiff was interested in the position. (TT 484-85; DX Q, at 1-2 [Exhibit 7 to Bergstein Aff.]). Yet, although HR had signed off on the eligibility list and Frattali lacked authority to reject eligible candidates, Frattali said Plaintiff was not acceptable for this position. (TT 485, 496-98). While Frattali testified at trial that he denied Plaintiff certain training for the position for budgetary reasons (TT 499-500), he offered different testimony at deposition, claiming he denied the training for administrative reasons. (TT 501).

On February 6, 2014, HR sent another email that offered Plaintiff the Watch Engineer position at the Staten Island bridges, the George Washington Bridge or the Lincoln Tunnel. (DX T [Exh. U to Def. motion]). Plaintiff had to turn down this offer because, in order to update his

5

New York City high pressure license, he needed to work at LaGuardia for five years.  (TT 66, 237-38).

### 6.  Frattali subjects Plaintiff to workplace harassment through racial slurs.

After the union intervened on Plaintiff's behalf in attempting to secure him the Watch Engineer position, Plaintiff began to receive a series of counseling memos.  (TT 77).  Although Ward insisted at trial that Frattali did not assist in writing any of the memos (TT 627-29), Frattali testified that he helped draft them (TT 732), and he told Plaintiff "that if I decline the watch engineer position, he's going to stop writing me up, he's going to stop harassing me, and he's going to stop doing whatever he was doing."  (TT 79).

Frattali also began to harass Plaintiff by following him around on the job and "and he would constantly look over my shoulder and he would criticize everything that I do.  He would yell and he would fight me if I can't get the job done, he's going to try to get somebody else to come and do the job.  It's been like this constantly over the past months.  That's all he does, whenever I'm there on days and he was there, he would do it."  (TT 79-80).  Frattali even came into the workplace for this purpose when he was not on duty.  (TT 80).  This harassment distracted Plaintiff as Frattali "will just stand there, he wouldn't say anything, he will just stand there and then all of a sudden he would start screaming."  (TT 80).  *See also* TT 365 (Plaintiff recalled that Frattali showed up during Plaintiff's shift and stood over him while Plaintiff tried to work).  Frattali did this "because I was the only Indian in that facility that was trying to elevate in there, and for some reason, I think that he didn't really want me to go anywhere, he just wanted me to remain USM so that way I could be under him at all times."  (TT 80).  After Frattali issued two more counseling memos, prompted by Frattali's promise to stop harassing him, Plaintiff declined the Watch Engineer position that Port Authority had offered to him.  (TT

124-25).  Plaintiff ultimately declined this position on at least three occasions in order to stop Frattali from harassing him any further.  (TT 125-26).

Plaintiff deduced that Frattali's hostility was racially-motivated because of an incident that took place when a water leak sprung at the airport on January 9, 2014.  (PX 28 [Exh. Z to Def. motion]).  On this occasion, Frattali directed Plaintiff to shut off the water even though the sergeant alone has that authority.  Otherwise, shutting off the pumps leaves the airport without water, even if a fire breaks out.  (TT 81).  When Plaintiff did not comply with Frattali's directive, he said, "You fucking Indian asshole.  Shut the pump down.  Are you stupid? . . . That's why you people are the way you are."  (TT 81).  *See also* TT 209 (Plaintiff testified that Frattali said, "You fucking Indian asshole, you are supposed to shut the pumps off and you didn't listen.  That's why you and your people are the way they are").  At trial, Frattali did not deny yelling at Plaintiff, though moments later he claimed he "elevated [his] voice."  (TT 472-73).  Relatedly, after Plaintiff filed a discrimination charge, Frattali confronted Plaintiff, calling him "wanna be," telling Plaintiff, "You Indians want to be Americans."  Frattali then told Plaintiff that he was "not white" and that Plaintiff should "go back to my country where I came from."  (TT 82, 228).

### 7. Plaintiff files an EEO charge with Port Authority.

On January 21, 2014, after Frattali called him a "fucking Indian asshole," Plaintiff filed an internal EEO charge against Frattali.  (PX 5 [Exh. F to Def. motion]).  Frattali's racial statements also prompted Plaintiff to complain to Frattali's boss, who expressed indifference in telling Plaintiff that he "was blowing everything out of proportion."  (TT 82).  Plaintiff further reported Frattali's racist comments to Human Resources (TT 229), which "did not do anything for me."  (TT 82-83).  Nor did the Port Authority's Equal Employment Opportunity office

7

intervene when Plaintiff filed the EEO charge (TT 83; PX 5 [Exh. F to Def. motion]) and verbally told EEO on at least two occasions that Frattali had made racist statements about Plaintiff's Indian heritage. (TT 212-14). Frattali knew about the charge when Plaintiff filed it, and the EEO office told Frattali that he was prohibited from retaliating about Plaintiff. (TT 506-07).

Although Wayne Turner, Port Authority's Senior EEO Specialist, understood that Plaintiff claimed Frattali had discriminated against him and treated him unfairly, he did not even ask Plaintiff if he was basing his claim on national origin or racial discrimination. (TT 269-271, 292-94). Turner did not deem it remarkable that Plaintiff received the belated write-up only a few weeks after he filed the EEO charge. (TT 308, 311-12). Nor was Turner even aware that Plaintiff had a clean disciplinary record until this point, or that he had received accolades for his work. (TT 317).

Turner conducted a cursory review of the EEO charge, admitting that his office does not always ask the complainant such basic questions as the race of any similarly-situated coworkers. (TT 270-71, 294-95, 300). Although Plaintiff claimed Frattali had singled him out, Turner could not recall asking Plaintiff the race of his co-workers. (TT 303-04). Nor did Turner speak with Ward about the EEO charge, and Ward was not even aware at the time that Plaintiff had filed this charge against him and Frattali. (TT 629-631). While the EEO office sometimes investigates retaliation claims where the employee is written up for something that took place prior to the EEO filing, Turner did not do so in Plaintiff's case, even though Plaintiff (1) filed the EEO charge on January 21, 2014 and (2) received two counseling memos on February 4, 2014 in connection with incidents that took place weeks earlier. (TT 314-15, 318). More broadly, despite the sequence of events set forth in Plaintiff's discrimination charges, Turner did not

suspect retaliation or discrimination, testifying that while employees often file EEO charges because they are being treated unfairly, that does not mean they have asserted a Title VII violation even where, as here, Plaintiff alleged that Frattali had falsified evidence against him. (TT 327-29). At trial, Turner minimized Plaintiff's grievances by insisting they only raised union matters. (TT 330-33). Not surprisingly, Turner did not think Plaintiff had alleged a Title VII claim. (TT 304-05).

Further demonstrating Turner's cavalier approach toward the EEO complaint, while Turner knew that Plaintiff believed that Frattali began retaliating against him because of the EEO charge, Turner did not treat Plaintiff's filing as a retaliation complaint even though Turner conceded "this could be possible retaliation." (TT 295-96). While Turner knew that Frattali was at the center of Plaintiff's complaints, Turner did not even speak with Frattali about the allegations. (TT 302).

### 8. The first February 4, 2014 counseling memo.

Plaintiff worked for Port Authority for three years without any write-ups or counseling memos. (TT 378, 510-11). This changed in early 2014 (TT 398), after Plaintiff complained to EEO. (TT 92-93). Frattali testified that he thought Plaintiff allowed his performance to decline after his probationary period ended in January 2012. (TT 511). Yet, it was another two years before Frattali charged Plaintiff with misconduct. (TT 511). On February 4, 2014, Plaintiff received two counseling memos. (PX 27-28 [Exhibits Y and Z to Def. motion]).

The first counseling memo that day accused Plaintiff of taking an extra hour of comp time on December 12, 2013. (PX 27). In fact, Plaintiff testified, he took two hours of comp time but was charged for three. (TT 96). Plaintiff was also falsely accused of raising his voice

9

and being confrontational with Ward.  (PX 27; TT 199-200, 377).  While Ward signed the memo, Plaintiff testified that "the words that was used in that memo was some of the words that Mr. Frattali would use."  (TT 202).  This episode took place nearly two months before Plaintiff finally received the counseling memo (TT 605-06; PX 28), after Plaintiff filed the EEO charge in January 2014, in which Plaintiff explicitly complained about "discrimination" and checked off the box for retaliation  (PX 5, at 1-2 [Exh. F to Def motion]).

### 9.  The second February 4, 2014 counseling memo.

On February 4, 2014, Plaintiff also received Exhibit 28, which concerned the water pump incident that took place one month earlier.  (TT 95-96; Exh. Z to Def. motion).  Ward wrote this memo in consultation with Frattali.  (TT 607).  During that episode, when the pumps were flowing 8,000 gallons of water into Hanger 4 per minute, pursuant to Frattali's directive, Plaintiff tried without success to shut off the water.  (TT 204-06).  The police sergeant, and not Plaintiff, was responsible for turning off the pumps.  (TT 207-08, 384).  Confronted with the Port Authority policy, Frattali acknowledged at trial that "[t]he police sergeant is responsible for determining the cause of the alarm, *i.e.*, fire or water leak, et cetera, . . . issues the appropriate orders or instructions to his crew and the personnel at the fire pump station.  The area is restored upon instructions of the police sergeant only[.]"  (TT 471, PX 28, at 3 [Exh. Z to Def. motion]).

### 10.  The first March 27, 2014 counseling memo.

On March 27, 2014, Plaintiff received a counseling memo that accused him of failing to turn on the boiler even though temperatures fell below freezing overnight.  (PX 29 [Exh. BB to Def. motion]).  In fact, Plaintiff testified, USMs were directed to turn on the boiler when the temperature fell below 32 degrees for more than eight hours.  (TT 99).  Otherwise, the engineer – who monitors the temperature from his work location (TT 222-23) – must direct the USM to turn

on the boiler. (TT 99, 222). That night, the temperature did not meet the eight-hour threshold, and Plaintiff received no such directive. (TT 99). The Watch Engineer on duty that night, Eric Francis, told Frattali he would take responsibility for not turning on the boiler. (TT 386). Frattali acknowledged at trial that another supervisor, Angel Camacho, should have advised Plaintiff to switch off the pump. (TT 478-81). Memos like this blocked Plaintiff's promotions with Port Authority. (TT 100, 115).

On March 25, 2014, two days before he received this counseling memo, Plaintiff was again offered the Watch Engineer position. (TT 98). Although Plaintiff wanted this promotion, he declined the offer because he feared Frattali would otherwise retaliate against him. (TT 121, 240). *See also* TT 244 ("I declined that position because [Frattali] threatened me"). When Plaintiff declined this position in April 2014, HR told Plaintiff that he would return to his USM position. (TT 128-29, PX 21 [Exh. W to Def. motion]). By this point, Plaintiff had a tentative job offer from the Department of Correction. (TT 242-43). Plaintiff completed the "new hire" packet for that position in June 2014. (TT 246-48). Still, Plaintiff did not start work with the Department of Correction until October 27, 2014. (TT 256, 357). In August 2014, Plaintiff again turned down a Watch Engineer position out of fear that Frattali would retaliate against him. (TT 250-51).

**11. The second March 27, 2014 counseling memo.**

Plaintiff received another counseling memo on April 24, 2014 over an incident that transpired on February 23, 2014. (TT 130; PX 30 [Exh. AA to Def. motion]). The memo was dated March 27, 2014. (PX 30). (Ward testified this memo should have been dated April 2, 2014. [TT 626-27]). Following this incident, but before management served him with this counseling memo, Plaintiff had complained to EEO about discrimination. (TT 130).

11

Frattali collaborated with Ward on this memo even though Frattali did not work on the day of the incident. (TT 476-77, 627). In the memo, Ward claimed Plaintiff had failed to correct a loose boiler coupling and had improperly completed a log entry. (PX 30). However, Plaintiff did not troubleshoot the boiler because he had just come in for his shift and had to make the rounds at the entire airport (a four-to-five hour task), and, referring to Watch Engineer Angel Camacho, explained that "[t]he engineer instructed to leave it until the day instrument technician came in and he will take care of it." (TT 218).

### 12. The July 17, 2014 counseling memo.

On July 17, 2014, Plaintiff received another counseling memo, in which Frattali claimed that Plaintiff had left work without permission. (DX S-1 [Exh. CC to Def. motion]). The memo was false; Plaintiff had received permission to leave work early with a coworker. (TT 131-32, 225-26, 400-01). Plaintiff had no prior AWOL or attendance issues. (TT 132-33). Between April 21, 2014 and July 17, 2014, Plaintiff was again offered the Watch Engineer position; he again declined the offer. (TT 133). Plaintiff told HR in writing that he had no choice but to turn down the position, noting that Frattali had threatened to otherwise fire him:

> [T]he reason I am declining the Watch Engineer position here at LaGuardia was not of my free will but I was forced to do so. I don't know if you remember back in January 2014, you offered me the position and my supervisor Gary Frattali responded by saying that I will not be an engineer here at LGA[.] [Y]ou later reply stating that I will NOT get that position. After that . . . I was granted the position and was scheduled to go and do the medical, which I did and was supposed to start my indoctrination process. *But I was confronted by Mr. Frattali[.] [H]e threatened me that if I took the Watch Engineer Position that he will continue to have me written up until he has justifiable reason to get me fired from the Port Authority. He went on saying that if I decline the position that he will stop writing me up and things will be normal again.* I have two kids and a mortgage to pay[.] . . . If I took it now he will want to retaliate against me and I don't want to go through the stress again. I at once even got Doug Egan and EEOC involve[d] in the situation but no one

12

> was willing to help me.  So Vincent on that being said I don't know if it's the right choice I am making but if its going to give me peace of mind and not being discriminated against then I think am better off not being an Engineer.

(PX 24 [Exhibit 8 to Bergstein Aff.]; TT 133-34) (emphasis supplied).  The Port Authority EEO "did nothing for that complaint," claiming it was merely a union issue.  (TT 153-54).

### 13.  Plaintiff files a charge of discrimination with the EEOC.

On May 13, 2014, Plaintiff filed a charge of discrimination with the EEOC, which set forth Frattali's discriminatory remarks toward Plaintiff.  (TT 149, 306-311; PX 7 ¶¶ 25, 44, 52 [Exhibit 9 to Bergstein Aff.]).  Port Authority contacted the EEOC about the charge on October 2, 2014.  (TT 150-51; PX 53 [Exhibit 10 to Bergstein Aff.]).  Frattali was contemporaneously aware of this charge, making it the third time the EEO office had notified Defendants that Plaintiff claimed that Frattali had discriminated against him.  (TT 508-09).  Although Plaintiff was still a current Port Authority employee, Wayne Turner, Port Authority's EEO specialist, did not question Plaintiff about these allegations before concluding that Plaintiff had not alleged a Title VII violation.  (TT 308, 311-12, 334-35, 340-41 [testifying that he communicated with Plaintiff's co-workers and got Frattali's side of the story without contacting Plaintiff]).  Nor did anyone from Port Authority speak with Ward about the EEOC charge.  (TT 629).

### 14.  Port Authority accuses Plaintiff of sabotaging equipment.

In October 2014, a week or two after Plaintiff filed the EEOC charge, Port Authority accused Plaintiff of criminal mischief, sabotaging the boilers at LaGuardia Airport.  (TT 141).  Frattali conceded at trial that he had accused Plaintiff of sabotaging the boiler even though he admittedly had no evidence to support that allegation.  (TT 144, 509, 529-30, 728).  Frattali further admitted that his only basis for suspecting Plaintiff was that Frattali had written up

Plaintiff in the past, and because Plaintiff had accused him of discrimination; Frattali believed Plaintiff had sabotaged the boilers to retaliate against Frattali. (TT 510, 730). When he accused Plaintiff of this serious misconduct, Frattali knew about the EEOC charge and was aware of Plaintiff's heritage. (TT 512-15). Other than Frattali, no one at Port Authority thought Plaintiff had anything to do with the sabotage. (TT 530-31).

After hearing Frattali and Michael Appiah discussing how someone had cut the wires from one of the boilers, Plaintiff went home without giving it much thought, unaware that Frattali had accused him of sabotage. (TT 141, 727-28). Later that day, two men from the Port Authority Inspector General's office went to Plaintiff's house to ask about the criminal mischief, stating that Plaintiff was "singled out as the number one suspect" and was under investigation. (TT 141-43). Plaintiff was suspended with pay on October 17, 2014. (TT 143, PX 32). Although Wayne Turner, Port Authority's EEO specialist, had "heard about" Plaintiff's suspension arising from the boiler sabotage incident, he was not aware that Frattali was behind the allegation. (TT 322-23). Of his 24 colleagues who had access to the boiler, Plaintiff was the only one who was singled out. (TT 144). The Inspector General cleared Plaintiff of the charges in early 2015. (TT 152).

### 15. Plaintiff's pain and suffering.

The stress associated with Frattali's harassment led Plaintiff to avoid Frattali at work, often eating lunch alone in his truck if Frattali was in the break room. (TT 135). Plaintiff also explained in detail how the work stress affected him:

> I started to question myself, I have to be doing something wrong. You know, I tried everything possible to do everything better but there was never anything I could have done to please him.

> That end very, very bad, you know, for me at that time. I would even lay

14

> in my bed at nights and I would think should I go into work the next day.
> What is he going to do?  What is he going to say?  And these were the
> things and my best days at work is whenever he is not there.  I would sit
> there and think about this and I keep pondering and asking myself, how
> can I be a husband and a family home?  How can I be a family home when
> this man is taking everything from me?  I'm being belittled.  I keep
> questioning my manhood.  How can I be a husband I can't even stand up
> for myself at work.  You know, I couldn't even look at my co-workers in
> their face and talk to them.  I feel so embarrassed and so little that at times
> I just sit and think that, you know, I don't think that this would ever end.
> And those were the thing that just keep me up at night.  And . . . there
> wasn't any way out of any of these things.  And it started to break me
> down, break me down into something that I didn't see myself as before.

(TT 135-36).

Over time, Plaintiff became "very angry" and could not sleep.  (TT 136).  He was

unable to function at work and took out his anger against his wife and children, and "they

couldn't come anywhere next to me."  *Id.*  The stress impacted Plaintiff's marital relations, and

he thought he was becoming impotent and his life was over.  (TT 137).  "[T]he only way I

started to deal with that was I started to drink heavily.  When I'm at home I would drink and

again I would be resentful at home.  I just wouldn't want to be bothered.  I would be in my

basement and I will drink until I pass out."  *Id.*  Plaintiff drank daily, as it was "the only thing

that would take the pain away at that time. . . . [I]t just eases everything for that moment.  *Id.*

Plaintiff also drank excessively in his car.  *Id.*

The stress impacted Plaintiff's marriage, and he and his wife "would fight

constantly."  (TT 138).  Previously a God-fearing man, Plaintiff now "didn't fear anything" and

"let everything go" because "[n]obody was out there willing to help me and now my life I feel it

has been taken away from me."  *Id.*  He explained:

> Whenever I'll be drinking . . . just to prove to myself that I'm still a man,
> whenever I have the urge to have sex, I would pay and I would go and
> have sex.  If I'm at the bar and I have the urge I would go with random

15

> people. It doesn't really matter. I was winning to do anything just to
> prove that the one thing that I had was not taken away from me. The most
> disgusting thing that I did was I was at the bar and there was this
> transgender woman I end up and I had sex with her.

(TT 138). This self-destructive behavior was out-of-character (TT 449-450) and lasted for

months. (TT 140). Plaintiff "began to see the light at the end of the tunnel" when he learned

about the new position with the Department of Correction in August 2014. (TT 140, 155).

However, Plaintiff's job experience remained miserable until he left Port Authority in October

2014. (TT 140).

In February 2014, Plaintiff consulted with Dr. Michele Martinho for the first time

about his anxiety and insomnia, which Plaintiff attributed to work-related issues. (TT 429, 439).

Dr. Martinho prescribed an antidepressant. (TT 430). A few months later, Plaintiff returned to

Dr. Martinho, this time complaining of increased anxiety and insomnia, for which she prescribed

medication. (TT 431, 434, 439-440).

As a result of the stress and anxiety, in 2014, Plaintiff began seeing a psychiatrist, Dr.

Stanley Schneider, once a week for four to five months. Plaintiff continued to see a doctor for

two months after leaving Port Authority. (TT 139, 154-55, 254). Plaintiff saw Dr. Schneider on

14 occasions. (TT 254, 451). Plaintiff's "chief complaint that he was being abused and

intimidated by his supervisor, and that was making him very anxious and he had no out because

if he left the company, he . . . .was trying to get a license in engineering. He had another year to

go and he was terrified of leaving." (TT 446). Plaintiff also told Dr. Schneider about Frattali's

racist comments. (TT 446-47). In addition, Plaintiff said the work-related stress was causing

marital difficulties and affecting his relationship with his children. (TT 447). Plaintiff was

prescribed medication for anxiety, sleeplessness and erectile dysfunction. (TT 139). But even

with the medication, when Plaintiff saw Frattali, he felt like he was going to "pass out." *Id.*

### 16. The verdict.

The jury found that Defendants subjected Plaintiff to a hostile work environment on the basis of race or national origin. The jury awarded Plaintiff $2.160 million on damages for pain and suffering. The jury awarded Plaintiff $150,000 in punitive damages against Frattali. (TT 839-840).

**ARGUMENT**

**POINT I**

**DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW**

### A. Defendant waived its rights under Rule 50(b) in making a cursory Rule 50(a) motion at trial.

Under Rule 50(a)(2), the party seeking JMOL must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." "Although Rule 50(a) 'does not define how specific' the motion must be . . . the purpose of requiring the moving party to articulate the ground on which JMOL is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.' . . . Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286–87 (2d Cir. 1998) (citing *inter alia Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993) (conclusory statement that "[d]efendants move for [JMOL]" was inadequate)). *See also Samuels v. Air Trans. Local 504*, 992 F.2d 12, 15 (2d Cir.1993) ("[t]he moving party must set forth a statement of the specific grounds it relies on for the relief sought. The adequacy of a directed verdict motion is tested by whether counsel observed the specificity requirement of Rule

50(a)").

After Plaintiff put on his direct case, Defendants' counsel simply stated, "I'd like to move to dismiss for failure to put on a *prima facie* case[.]"  (TT 546).  That argument did not articulate any precise basis for Rule 50(a) relief, and it did not place Plaintiff on notice of any deficiencies in his case.  It is also unclear what Defendants were asserting, as the hostile work environment analysis does not have a *prima facie* inquiry.  Since the Rule 50(a) motion was defective, Defendants have waived any arguments under Rule 50(b), and the standard of review is whether they will suffer "manifest injustice."  *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998).  As demonstrated below, Defendants cannot meet that high standard.

### B. The jury had an evidentiary basis to find that Defendants subjected Plaintiff to a hostile work environment on the basis of race/national origin.

"[A] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."  *Matusick v. Erie Cty. Water Auth.*, 739 F.3d 51, 72 (2d Cir. 2014).

"In ruling on a motion for JMOL, the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.  The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.  In making its evaluation, the court should 'review all of the evidence in the record,' but it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving

party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001).

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). " This 'high bar' may be met when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture' or 'there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded persons could not arrive at a verdict against it.'" *Fisher v. Mermaid Manor Home for Adults, LLC*, No. 14-CV-3461 (WFK)(JO), 2016 WL 7330554, at *1 (E.D.N.Y. Dec. 16, 2016).

"To prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

This Court should view the evidence "cumulatively in order to obtain a realistic view of the work environment . . . and to determine whether they alter[ed] the conditions of [plaintiff's] employment and create[d] an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 695 (2d Cir. 2012). "To establish[] this element, a plaintiff need not show that h[is] hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012). "Since one of the critical inquiries with respect to a hostile environment

claim is the nature of the environment itself, evidence of the general work atmosphere is relevant." *Id.*

Differential treatment, discipline and work assignments on the basis of race may support a hostile-work environment claim, even when the abuse is facially neutral. *Pucino v. Verizon Communs., Inc.*, 618 F.3d 112, 118 (2d Cir. 2010). *See also id.* at 118-19 ("There is little question that incidents that are facially [race]-neutral may sometimes be used to establish a course of [race]-based discrimination – for example, where the same individual is accused of multiple acts of harassment, some overtly [racial] and some not"). In *Pucino*, the Court of Appeals held that plaintiff made out a hostile work environment claim on the basis of unequal work assignments and evidence that her supervisor had referred to female employees as "bitches" and therefore had "reflected hostility to women." *Id.* at 118.

Viewing the evidence as a whole, and bearing in mind that the Court of Appeals has "repeatedly cautioned against setting the bar too high," the jury had ample basis to find that Frattali's racial discrimination and harassment altered Plaintiff's work environment "for the worse." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Denying Defendant summary judgment on a similar record, this Court stated:

> Frattali's repeated derogatory comments regarding Plaintiff's race and national origin are objectively offensive and disturbing. Considering the totality of the circumstances – including Frattali's objection to Plaintiff's promotion, as well as other relevant background evidence of prior denials of training and promotion – Plaintiff has offered sufficient evidence to permit a fact-finder to conclude that he suffered from a hostile work environment predicated on animosity regarding his national origin, and that such hostility may have been exacerbated by race-based animus.

(ECF 51, at 8). On three occasions, Frattali disparaged Plaintiff's national origin while he (1) actively interfered with Plaintiff's professional advancement; (2) participated in drafting false

20

counseling memos after Plaintiff filed EEO and EEOC charges; and (3) baselessly accused Plaintiff of having sabotaged a boiler simply because Plaintiff had complained about Frattali's racial discrimination.

Frattali plainly demonstrated hostility toward Plaintiff's national origin, stating in connection with a workplace episode, "You fucking Indian asshole. Shut the pump down. Are you stupid? . . . That's why you people are the way you are." (TT 81). After Plaintiff filed an EEOC charge, Frattali called Plaintiff a "wanna be," meaning, "You Indians want to be Americans." Frattali then told Plaintiff that he was "not white" and that Plaintiff should "go back to my country where I came from." (TT 82, 228). Courts "consider the use of 'you people' and similar phrases . . . as circumstantial evidence of discriminatory animus[.]" *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 253 n.14 (S.D.N.Y. 2014). *See also Lewis v. American Sugar Refining, Inc.*, 325 F. Supp. 3d 321, 354-55 (S.D.N.Y. 2018) (jury could find that supervisor harbored racial animus in referring to plaintiff as "you people"); *Creacy v. BCBG Max Azria Grp., LLC*, 14 Civ. 10008 (ER), 2017 U.S. Dist. LEXIS 49523, at *22 (S.D.N.Y. Mar. 31, 2017) ("Courts in this Circuit have held that a jury can reasonably interpret 'you people' or 'your kind' as having a racial meaning"); *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 337 (E.D.N.Y. 2015) ("phrases such as 'you people' . . . 'could just as easily be interpreted as [having] a negative racial connotation[,]' particularly when Plaintiffs 'provide greater specificity as to the context of [such phrases'] usage'") (citing *inter alia Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 53 (S.D.N.Y. 2009) (statements such as, "you people cannot do anything right," permit a reasonable jury to find discriminatory motivation).

Seeking JMOL, Defendants argue that these discriminatory statements "will not alter a work place" and that no one corroborated them. (Def. Br. at 18). Defendants further argue that

21

other black employees never heard Frattali use racial epithets.  *Id.*  Yet, as this Court stated in *Fisher*, the antidiscrimination laws prohibit discrimination against the individual, not a group of individuals.  2016 WL 7330554, at *3.  While Defendants attempt to show that each counseling memo had a legitimate basis (Def. Br. at 19), they overlook how (1) Plaintiff received no such counseling before he charged Frattali with discrimination and (2) Plaintiff disputed the factual predicate for each memo.  "The jury is charged with weighing conflicting testimony, and a district court should not grant a new trial on the basis that there is conflicting testimony going to credibility.  The fact that Plaintiff's testimony on this issue was in conflict with the testimony of two of Defendants' witnesses does not render Plaintiff's testimony incredible.  It is the province of the jury to weigh the conflicting testimony to determine which side is credible."  *Lewis*, 325 F. Supp. 2d at 341.  *See also id.* at 353 ("On a motion for judgment as a matter of law, the court will credit testimony favorable to the movant, if that testimony was not impeached or contravened.  Defendants, however, continually refer the court to testimony that was contravened or testimony that on its own does not constitute 'an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him'").

Defendants also argue the facts surrounding Frattali's other acts of harassment.  While Defendants claim Plaintiff was not aggrieved over the PSA because does not know Funaro's qualifications (Def. Br. at 2-3), Frattali admitted that Funaro lacked the requisite three years' experience (TT 468-69), and Plaintiff produced direct evidence that Frattali did not recommend him for the PSA because of his national origin.  (TT51-52).  While Defendants minimize Frattali's refusal to provide Plaintiff boiler training because Plaintiff received it in 2012 and 2013 and Frattali allowed others to undergo training outside New York City (Def. Br.

22

at 5), the prior training has no bearing on whether Frattali denied other necessary training in 2013, and Frattali's sole reason for this adverse decision was that it was "too much for [Plaintiff] to comprehend," a patronizing justification for this experienced employee. (TT 176-77). Similarly, in discussing the Watch Engineer position, Defendants overlook Plaintiff's evidence that Frattali somehow learned his confidential test results (TT 75, 482-83), made it clear that Plaintiff would "never be a watch engineer at this facility" (TT 74) and did not reach out to Plaintiff when HR expressed interest in Plaintiff for the position. (TT 503-05). And Defendant truly spins the facts surrounding Plaintiff's interrogation over the alleged boiler sabotage. While Defendants concede that "Frattali told the inspectors that he suspected plaintiff because plaintiff had circulated a complaint in July 2014 alleging discrimination" (Def. Br. at 14), they add that Frattali had objected to Plaintiff's suspension with full pay and benefits. *Id.* at 15. Yet, the jury could find that Plaintiff would never have suffered that indignity had Frattali not falsely accused him of this crime, for which Plaintiff was fully cleared. The sabotage allegation was a particularly vicious act of revenge by Frattali, who had endeavored to make Plaintiff's life miserable for several years, as evidenced by the flurry of unfair counseling memos and explicitly racist statements about Plaintiff's national origin. While Defendant claims the false sabotage allegation "can hardly be the cause of a hostile work environment" because Plaintiff was set to start a new position with the Department of Corrections (Def. Br. at 19), Frattali's attempt to destroy Plaintiff's reputation, expose him to possible criminal charges and make him essentially unemployable took place while he still worked for Port Authority.

**POINT II**

**THE DAMAGES AWARD DOES NOT SHOCK THE CONSCIENCE**

"The 'calculation of damages is the province of the jury,' and 'we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages.' . . . We have observed repeatedly that juries have wide latitude in setting compensation for damages, stressing that our review is 'narrow,' considering [under federal law] only 'whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014).

Courts in this Circuit have identified three categories of damages for pain and suffering in discrimination cases: (1) garden variety; (2) significant and (3) egregious. "In 'garden variety' emotional distress claims, 'the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.' Such claims typically 'lack[ ] extraordinary circumstances' and are not supported by any medical corroboration.' 'Significant' emotional distress claims 'differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.'" *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46-47 (E.D.N.Y. 2009).

"'Significant' emotional distress claims 'differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. . . . "[E]gregious' emotional

distress claims 'generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff.' In 'significant' or 'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in lifestyle,' larger damage awards may be warranted." *Id.* at 46–47. "Significant" damages claims range from $100,000 to $500,000. *Thorsen v. County of Nassau*, 722 F. Supp. 2d 277, 293 (E.D.N.Y. 2010). "In 'egregious' cases, damage awards in excess of $500,000 have been upheld." *Duarte v. St. Barnabas Hosp.*, No. 15 CIV. 6824 (PGG), 2018 WL 4440501, at *9 (S.D.N.Y. Sept. 17, 2018).

Plaintiff suffered egregious pain and suffering. The work-related stress caused depression, anxiety, impotency, insomnia, erectile dysfunction and excessive drinking as he fought with and isolated himself from his family and went from being a "God-fearing man" to having sex with random strangers. Plaintiff met with two doctors, had repeated counseling visits and took medication for the mental health issues that had thrown him into a dark emotional hole. Contrary to Defendants' argument, these are not garden variety damages but egregious, and at a minimum, significant. (Def. Br. at 21). In assessing Plaintiff's damages, the jury was free to consider how Port Authority's EEO office failed to take his internal complaints seriously, both allowing the harassment to continue unabated and signaling to Frattali that his discriminatory harassment would go unpunished, causing Plaintiff further pain and humiliation.

In *Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002), the Court of Appeals upheld a $400,000 verdict in a harassment case ($570,161.49 in 2018 dollars), noting that "Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. Phillips and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. Phillips' co-workers testified about the

deterioration they observed in Phillips." *Id.* at 111-12.[1]  *Compare Osorio v. Source Enterprises*, 05 Civ. 10029, at *5 (JSR), 2007 U.S. Dist. LEXIS 18725 (S.D.N.Y. March 5, 2007) (upholding $4 million for pain and suffering in retaliation case where "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation"); *Hughes v. PBA*, 850 F.2d 876 (2d Cir. 1988) (sustaining $275,000 in emotional damages [$589,139.37 in 2018 dollars] where plaintiff alleged "campaign of harassment" in the workplace but he received no mental health treatment and made no claim of ongoing psychological problems); *Thorsen*, 772 F. Supp. 2d at 295 ($500,000 in emotional distress damages was not excessive where "the jury credited Thorsen's allegations that, not only did the defendants remove him from his job duties, but in doing so they subjected him to personal humiliation and attempted to destroy his professional reputation in retaliation for his political affiliation," and the plaintiff eventually stopped treatment and taking antidepressants); *Olsen*, 615 F. Supp. 2d at 47 (declining to remit Plaintiff Ketcham's $400,000 award for pain and suffering [$469,571.81 in 2018 dollars] where she "testified that the discrimination she suffered affected her 'immensely'" and the discrimination caused her to feel "disillusioned and very disappointed" and "caused her to become very 'stressed' and 'anxious' about what would happen next at work (*i.e.*, would someone 'play a ridiculous prank' or 'say something offensive'), which carried over into her personal life," prompting her to seek counseling); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 197-98 (E.D.N.Y. 2006) (upholding $600,000 [$682,000 in 2018 dollars] in pain and suffering in disability discrimination case where the discrimination caused the plaintiff "great suffering," he

---

[1] "When considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [plaintiff's] injuries today is higher than what it would have been ten years ago." *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003).

lost interest in school, lost his appetite, cried for no reason, "displayed an overall demeanor that steadily worsened over time" and underwent psychiatric treatment).  As Plaintiff put on evidence of the severity of pain and suffering and the damages award falls in line with these cases, remittitur is unwarranted.

## POINT III

### THE PUNITIVE DAMAGES AWARD IS APPROPRIATE

"The question faced by a federal court in reviewing a jury's verdict for excessiveness has long been whether the amount of the jury's award is 'so high as to shock the judicial conscience and constitute a denial of justice.'"  *Payne v. Jones*, 711 F.3d 85, 96 (2d Cir. 2012). Judicial review of a punitive damages award "is guided by three factors identified by the Supreme Court: '(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'"  *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006).  "[T]he degree of reprehensibility of the defendant's misconduct [is] '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *Payne*, 711 F.3d at 101.

The jury properly found that Frattali's discrimination against Plaintiff was egregious, as Frattali interfered with Plaintiff's career growth, called him a "fucking Indian" and other racial slurs, issued Plaintiff baseless counseling memos and retaliated against Plaintiff by falsely accusing him of sabotaging equipment after Plaintiff filed an EEOC charge that implicated Frattali.  The jury was outraged over Frattali's discriminatory and reprehensible conduct, and the $150,000 punitive damages award falls within the range in discrimination cases. *See e.g. Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 149-150 (2d Cir. 2011) (remitting punitive

damages award to $190,000); *Lewis*, 325 F. Supp. 2d at 370 ("Comparable cases in the context of Title VII claims are constrained by the statutory caps, and have allowed plaintiffs like the Plaintiff here to recover $300,000 or the equivalent maximum statutory cap"); *Barham v. Wal-Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2017 WL 3736702, at *5 (D. Conn. Aug. 30, 2017) ("a punitive damages award of $175,000 appropriately reflects the malice and reckless indifference present in the evidentiary record here").

Defendants further seek to reduce Plaintiff's punitive damages award because this Court denied him the opportunity to put on his net worth. (Def. Br. at 24) (citing TT at 726-27). Frattali has waived this argument, as his counsel did not object when the Court closed off this line of questioning. (TT 727). While courts have discretion to bifurcate trials when the plaintiff seeks punitive damages "to avoid any undue prejudice during the liability phase," *Tillery v. Lynn*, 607 F. Supp. 399, 403 (S.D.N.Y. 1985), Defendants did not request bifurcation. *See generally E.E.O.C. v. Mavis Discount Tire, Inc.*, 129 F. Supp. 2d 90, 122 (S.D.N.Y. 2015); *Lewis*, 325 F. Supp. 2d at 337 ("The decision to bifurcate is in the discretion of the trial court, and its decision is dependent on the unique facts and circumstances of the case and there is no 'bright-line test'").

Finally, while Defendants claim that Port Authority is not indemnifying Frattali, this defendant  was acting within the scope of his employment, and Defendants have not argued otherwise. *See Woods v. New York City Dep't of Sanitation*, No. 98 CIV. 6918 (JSM), 1999 WL 476305, at *4 (S.D.N.Y. July 8, 1999) ("the City may be obligated to indemnify the individual defendants if their conduct was within the scope of their duties"). The punitive damages award should stand.

## CONCLUSION

This Court should deny Defendants' Rule 50/59 motion in its entirety.

Dated: November 13, 2018

Respectfully submitted,

s/ Stephen Bergstein

| | |
|---|---|
| STEPHEN BERGSTEIN | MARJORIE MESIDOR |
| | |
| BERGSTEIN & ULLRICH, LLP | PHILLIPS & ASSOCIATES |
| 5 Paradies Lane | 45 Broadway, Suite 620 |
| New Paltz, N.Y. 12561 | New York, N.Y. 10006 |
| (845) 469-1277 | (212) 248-7431 |
| | Counsel for Plaintiff |

29